[No. A092383. First Dist., Div. Four. Jan. 31, 2002.]

NOT ABOUT WATER COMMITTEE et al., Plaintiffs and Appellants, v. SOLANO COUNTY BOARD OF SUPERVISORS et al., Defendants and Respondents.

**COUNSEL**

Wagstaffe & Wagstaffe, Wagstaffe & Jellins and Paul Norton McCloskey for Plaintiffs and Appellants.

James W. Laughlin, County Counsel, for Defendants and Respondents.

## Opinion

**SEPULVEDA, J.**—This mandamus proceeding, brought by several owners of real property lying north of the City of Vacaville in rural Solano County, challenges as constitutionally flawed the formation of an assessment district and subsequent levy of an assessment on the real property encompassed within it—including the parcels owned by petitioners—by respondent Rural North Vacaville Water District. Petitioners, including Not About Water Committee, an unincorporated association, present an array of challenges to the validity of the assessment district. First, they contend the manner in which property owners were permitted to vote for or against the district's formation—the use of "weighted" voting proportional to the assessment to be imposed on each affected parcel—violates the due process clause of the Fifth Amendment to the federal Constitution as applied to California through the Fourteenth Amendment. Next, petitioners challenge the district's determination that their properties would be specially benefited by the formation of the assessment district, above and beyond the benefits common to the general public. Third, petitioners allege the formation of the assessment district violated provisions of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). Last, they contend asserted irregularities attending the formation of both the antecedent water district and the assessment district itself were so palpably unfair as to compel judicial intervention and relief.

As we explain, although cast as a suit in mandamus by petitioners, as a matter of law, this is a special statutory action known as a validation proceeding. The scope of our power of judicial review in such a proceeding is circumscribed in two significant ways, one substantive, the other procedural. Substantively, our review is limited by the principle that the formation of public improvement districts, like the assessment district challenged here, is a *legislative* act. Procedurally, our review is limited by the Legislature's determination that legal challenges to the formation of local public improvement districts must be heard in a single, exclusive form of action, the validation proceeding. In combination, these two principles limit the scope of our review of challenges to respondents' determinations that petitioners' real property will receive a special benefit, proportional to the assessments levied, as a result of the formation of the assessment district. We review de novo, as questions of law, both petitioners' constitutional challenge to the use of weighted voting in the assessment balloting and the claimed CEQA violation, and review the petitioners' remaining contentions under the substantial evidence rule.

We conclude the use of weighted voting under these circumstances did not deny petitioners due process of law within the meaning of the Fifth Amendment. Moreover, the use of such a weighted balloting scheme in the assessment district referendum was *required* by recently enacted provisions of the

California Constitution. We also decide the record made before the water district board demonstrates that the assessment district will provide petitioners with the required "special benefit"—in the form of fire protection services—one that is not disproportional to the assessments to be levied against their properties, and that petitioners' CEQA claim lacks merit. Last, we conclude petitioners' claims of a civil conspiracy involving the county board of supervisors, the water district board, members of the county planning staff, and certain unnamed real property owners within the water district are not supported by evidence in either of the records made before the water district board and the superior court. We will therefore affirm the judgment of the trial court.

## FACTUAL BACKGROUND

The scene is English Hills, rolling country north of Vacaville, lying roughly midway between Sacramento to the north and Silicon Valley to the southwest. Petitioners tell us that location, coupled with other factors, recently has fueled changes in the area, including the inexorable conversion of historically agricultural lands into rural residential enclaves. And, petitioners assert, it has long been understood by area residents that this process of land use conversion might proceed even more implacably if a shortage of potable water, a condition endemic to much but not all of the area, could be overcome by a modern water delivery system. Beginning some 13 years ago, in 1989, county officials and interested residents with parcels adjacent to English Hills began to explore the possibility of building such a system through the agency of a water district. Following a series of public meetings and an engineering study, the formation of such a water district was endorsed by the county board of supervisors and presented to area residents at a referendum conducted on June 25, 1996.

The record before us shows that the outline of the water district, as configured by civil engineers retained by the county, follows a somewhat crazy-quilt pattern, excluding from its perimeter those parcels with water wells, an exclusion explained in an engineer's report and by the board as being prompted by the recognition that, since these parcels did not need a water delivery system, they would not be assessed for the cost of one. Not being impacted by the project's cost, these "water well owners" were not provided with ballots for the referendum on the formation of the proposed water district. In due course, such a referendum on the fate of the proposed water district was conducted by the county, with each owner of real property lying within the proposed district having one vote, that is, under a one-parcel, one-vote or per capita balloting scheme. As certified by the board,

the pro-water district forces won the referendum handily: Formation of the water district was approved by a vote of 285 to 40.

The formation of a water district—denominated the Rural North Vacaville Water District (RNVWD)—having been approved by a majority of the included landowners and established by supervisorial resolutions, county officials next had to determine the scope of the contemplated water system and a means of financing its construction. Over the next two to three years, following another series of engineering studies and public hearings, the board voted unanimously to establish a "benefit assessment district," comprised of two zones, to fund construction of a water delivery system. Zone one consisted of those properties lying *within* the RNVWD formed following the 1996 referendum. Lots within zone one would receive water hookups at a per parcel connection cost of approximately $20,000; a second zone, zone two, was comprised of all those parcels lying in zone one *and* those parcels (some 233 of them) lying *outside* the water district. These latter parcels were included within the proposed assessment district under statutes authorizing such "extraterritorial" reach under specified circumstances. A subclass of zone two parcels, composed of those property owners with land outside the original water district boundaries, would receive fire protection services from the assessment district, at an average parcel cost of about $2,400.

Unlike the per capita balloting scheme employed at the antecedent water district referendum, balloting on the formation of the proposed assessment district was by *weighted* vote, that is, votes were allotted in proportion to the financial obligations to be imposed on landowners within the proposed assessment district, assuming it passed. As a result of this wrinkle, zone one residents exercised, on average, on the order of eight times the voting power of that subclass of zone two residents who stood to gain only fire protection services if formation of the assessment district was approved.[1] It is clear from the record that the idea of forming an assessment district—particularly one with extraterritorial reach beyond the perimeter of the water district— met with immediate and active opposition from some area residents. For the most part, it appears from the record, these opponents were comprised of residents whose property lay outside the perimeter of the existing water district and who had adequate water supplies from wells on their parcels. These owners were, of course, roughly the same group of water well owners who, because their parcels were not included in the original water district,

---

[1] Or, as respondents put it in their brief, a property owner with a water connection for domestic water at a cost of $18,404 and fire suppression water at a cost of $2,880, would have almost eight times the weight of the vote of a property owner outside the water district having only a fire suppression water assessment of $2,880.

had not been provided ballots in the 1996 referendum. As the day for balloting on the proposed assessment district approached, opposition leaders—for convenience, we will refer to them as the English Hills owners[2]—circulated a petition, signed by more than 50 residents, calling on the board to delay the assessment district referendum.

Because the petition conveys the sentiment among this rump group, we quote part of it: "We the undersigned hereby petition the Rural North Vacaville Water District to delay the upcoming vote and re-evaluate the Fire Protection portion of the proposed district. . . . We . . . believe there has been a concerted effort to include as many parcels into the district as possible via the strategic location of 'fire hydrants.' This is especially disconcerting as we feel there is at least a moral, if not legal, obligation to leave all parcels out of the district who want to stay out as was promised during the district formation vote in 1996 . . . . Those of us left out of the vote were told we would be left out of the district . . . ." District officials declined to postpone the voting, the referendum went forward as planned, and the proposed assessment district carried the day by a vote of 79.1 percent to 20.9 percent.

The upshot of these machinations, petitioners assert, has been to give a minority of property owners—those with parcels lying within the water district—substantially greater voting power than those residing outside water district boundaries. In response to these events, petitioners, as dissident water well owners, filed this suit in mandate, asserting the voting scheme employed by the water district in the assessment referendum denied them due process of law under the Fifth Amendment to the federal Constitution and was, moreover, the product of a civil conspiracy among members of the county board of supervisors, the county planning commission, the water district, and a handful of local residents. Defending, the county relied on federal judicial precedents upholding weighted voting under comparable circumstances against Fifth Amendment challenge. Moreover, the county argued, voter approval of Proposition 218, amending article XIII of the California Constitution in 1996, required the use of a weighted voting scheme, proportional to the contemplated financial impact of the assessment. Following a hearing, the superior court granted judgment for the county and water district. This appeal by the petitioning property owners was timely perfected.

---

[2]We use the term English Hills as shorthand for a cluster of small areas lying within the assessment district, including Steiger Hills, Gibson Canyon, and Browns Valley, in all of which, it appears, some parcels have active water wells.

ANALYSIS

I. *Introduction.*

Before assessing the legal and evidential merit of their claims, a description of the case for relief petitioners attempt to make out on this appeal will prove useful. In substance, the petitioning property owners allege the existence of a lengthy conspiracy among county planning officials, members of the county's board of supervisors, and owners of real property lying within the original 1996 water district. The ultimate object of this scheme, petitioners assert, was to further the northward "rural residential" expansion of development in Solano County and, as a byproduct of that process, enrich property owners and swell the county's tax base. Aware of substantial opposition among property owners in the rural English Hills area to suburbanizing trends, petitioners allege respondents conspired with others to neutralize the voting strength of the water district opposition by employing a two-step process.

First, county officials gerrymandered the configuration of the proposed water district in a manner that would exclude those property owners with water wells on their parcels. Not needing a reliable water delivery service, some of these residents—a majority, had they been furnished ballots, according to petitioners—were not likely to support the creation of a water district, or so petitioners' argument runs. And, being excluded, these outlying residents were not provided ballots for the water district referendum. The proposal to form a water district, the balloting for which was controlled by the exclusion of those likely to be opposed to it, having won by a substantial margin, respondents allegedly then took the second step in their scheme to neutralize opposition, petitioners assert.

This step, according to petitioners, consisted of the proposed formation of a beneficial assessment district to finance construction and operation of the water district's delivery system, an assessment district with extraterritorial reach, that is, one encompassing not only the water district, but adjacent areas outside its boundaries, the residents of which would receive fire protection services from the water district. Moreover, petitioners allege, in order to ensure the success of the proposed assessment district, county officials allocated votes to affected property owners according to a weighted system, that is, voting power was proportional to the contemplated financial impact on the property owner in the event formation of the assessment district was approved. The effect of this maneuver, according to petitioners, was to give those parcel owners residing within the perimeter of the water district a multiple of the voting power given those owners residing in the

extraterritorial area of the proposed assessment district. And, petitioners add, had the principle of one person, one vote been adhered to, the anti-assessment-district forces would have defeated the formation proposal. As events unfolded, respondents successfully implemented the alleged scheme: Formation of the proposed beneficial assessment district was approved by affected property owners by a vote—expressed in terms of the proposed financial impact of the assessment district—of $6,951,764 "for" to $1,839,809 "against."

In sum, as petitioners put their case in the opening brief, "Respondents . . . have combined to impose an assessment of [petitioners'] properties for 15% of the cost of Water District's proposed $10.5 million water system after deliberately excluding [them] from the vote for the [water] District's creation and thereafter setting up a weighted voting system for assessing [petitioners'] properties *outside* the District under which [petitioners'] negative votes could not possibly prevail." (Italics added.)

II. *An Overview: Financing Municipal Improvements Through Beneficial Assessment Districts, the Events Leading to the Formation of Assessment District No. 1, and the Standard of Judicial Review.*

We digress to provide a summary of the law governing the use of assessment and similar districts to finance municipal improvements in California, to give an account of events leading up to the formation of the assessment district challenged by petitioners, and to identify the applicable standard of judicial review. The use of the special or beneficial assessment district as a device for financing the cost of public improvements has a long pedigree in the history of public finance in the United States. (See, e.g., 14 McQuillin, The Law of Municipal Corporations (3d rev. ed. 1998) Special Taxation and Local Assessments, §§ 38.01-38.338, pp. 11-851.) As one law review article on the use of benefit assessment districts has noted, in the 19th century, "local jurisdictions levied benefit assessments on property owners to finance street improvements abutting the owners' properties. Although the community at large benefited from street improvements in the city, those property owners along the new or improved streets received special benefits that enhanced their property values and thus justified payment of benefit assessments. . . . As the need for public improvements at the local level increased, local governments expanded the application of benefit assessments to other types of improvements." (Comment, *New Financing Strategy for Rapid Transit: Model Legislation Authorizing the Use of Benefit Assessments to Fund the Los Angeles Metro Rail* (1988) 35 UCLA L.Rev. 519, 524-525, fns. omitted.)

Our high court has said of the assessment device that it is "[a]nalogous to but differing in important respects from the power of taxation, the essential

feature of the special assessment is that the public improvement financed through it confers a special benefit on the property assessed beyond that conferred generally." (*Southern Cal. Rapid Transit Dist. v. Bolen* (1992) 1 Cal.4th 654, 661 [3 Cal.Rptr.2d 843, 822 P.2d 875] (*Bolen*).) Elsewhere, the court has described such districts as a " ' "compulsory charge placed by the state upon real property within a pre-determined district, made under express legislative authority for defraying in whole or in part the expense of a public improvement therein . . . ." ' " (*San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 161 [228 Cal.Rptr. 47, 720 P.2d 935].)

Following voter approval and formation of the RNVWD, the district's board took steps to form a beneficial assessment district under the provisions of the Municipal Improvement Act of 1913, for the purpose of financing construction of a water delivery system. (Sts. & Hy. Code, § 10000 et seq., (the 1913 Act).) In line with the procedural mechanics required under the 1913 Act, the district's board began the formation process in June 1999, certifying the final environmental impact report for the water system project, adopting a resolution of intention to form assessment district No. 1 (see Sts. & Hy. Code, § 10200), and referring the matter to a civil engineering firm engaged for preparation of the required engineer's report. (*Id.*, §§ 10203 & 10204.) Also in June 1999, the district filed a notice of determination for its water project as required by CEQA. After submission and review of the engineer's report, the board designated October 12, 1999, as the date for protests on the proposed assessment district and mailed ballots to the owners of record of property within the proposed district.

In the interim, the Solano County Board of Supervisors approved the water district's proposal to levy extraterritorial assessments, an act required by sections 10103 and 10104 of the Streets and Highways Code. On October 12, 1999, a protest hearing was held before the water district board. Ballots were weighted and tabulated by the amount of the proposed assessment to be imposed on the parcel for which the ballot was submitted. Under this weighted scheme, the votes cast in favor of the formation of the proposed assessment district No. 1 totaled 79 percent of the total votes cast. At the conclusion of the protest hearing, the district board adopted two resolutions, one declaring the assessment ballot results, and the other confirming and levying the assessments. (See Sts. & Hy. Code, § 10312.) Petitioners filed this action in mandamus on November 10, 1999, attacking the two resolutions adopted by the district board at the conclusion of the October 12 protest hearing. (*Id.*, § 10400 [30-day limitations statute].)

■ As noted, judicial review of challenges to public improvement determinations made by a local governmental agency is circumscribed both by

the legislative character of such municipal proceedings and the exclusivity of a special statutory proceeding—codified as Code of Civil Procedure sections 860 et seq.—as the sole procedure available "to determine [its] validity." (Code Civ. Proc., § 863.) The limitations on the scope of judicial review of such determinations was discussed by the California Supreme Court in *Dawson v. Town of Los Altos Hills* (1976) 16 Cal.3d 676 [129 Cal.Rptr. 97, 547 P.2d 1377] (*Dawson*). The Town of Los Altos Hills formed an assessment district for sanitation purposes and imposed assessments on the real property lying within it. Some landowners within the district sued for injunctive relief on the ground that the resolutions adopted by the town in connection with the formation of the district were tainted by fraud and thus void. Characterizing the plaintiffs' proceeding, the Supreme Court said that its "essential object . . . is a declaration that the [assessment] district . . . is without legal existence, and that all obligations and duties arising as a result of its formation are likewise of no legal effect. It is therefore an 'action or proceeding' contesting 'the validity of an assessment' [citations] and as such differs in no essential respect from other civil actions or special proceedings brought to test the validity of a special assessment.[3]" (*Id.* at p. 682.) The court's opinion continues: "The standard of judicial review which is applicable in such proceedings flows from the nature of the action being reviewed. A special assessment district . . . is not a legal entity with officers and corporate rights and duties. [R]ather such a district, in the words of the Municipal Improvement Act of 1913 . . . is merely 'the district of land to be benefited by the improvement and to be specially assessed to pay the costs and expenses of the improvement and the damages caused by the improvement.' [Citation.] . . . . [¶] As is manifest from this brief review, the establishment of a special assessment district takes place as a result of a peculiarly legislative process grounded in the taxing power of the sovereign. This was clearly recognized in early decisions of this court . . . . The scope of judicial review of such actions is accordingly quite narrow. . . . '[T]he court will not declare the assessment void unless it can plainly see from the face of the record, or from facts judicially known, that the assessment . . . is not proportional to the benefits, or that no benefits could accrue to the property assessed. . . .' [Citations.]" (*Dawson, supra,* 16 Cal.3d at pp. 682-684, fn. omitted.)

The continuing vitality of *Dawson, supra,* 16 Cal.3d 676, and the limitations announced therein governing judicial review of the formation of public improvement districts were reaffirmed by the California Supreme Court in *Knox v. City of Orland* (1992) 4 Cal.4th 132 [14 Cal.Rptr.2d 159, 841 P.2d 144] (*Knox*). There, our high court expressly rejected a request that it "reevaluate the standard of review announced in *Dawson*" in light of subsequent decisions. (*Id.* at p. 146.) It declined to do so. "We are not persuaded,"

---

[3][Citations.]

the *Knox* court wrote, "to deviate from the traditional standard of review which we reaffirmed in *Dawson* . . . ." (*Id.* at p. 147.) Applying the *Dawson* standard of review to the record before it, the court concluded that "[b]ased on this record, we see no basis for invalidating the city's determination of benefit under *Dawson* . . . . The record contains no evidence contradicting the city's benefit determination, and no facts that otherwise tend to show nonproportionality or absence of benefit to the assessed properties." (*Id.* at p. 148.) "Under *Dawson*," the *Knox* court concluded, "the city's determination of benefit, as set forth in its resolution approving the engineer's report, must be deemed conclusive in the absence of any contradictory evidence in the record." (*Id.* at p. 149, fn. omitted.)

Notwithstanding *Knox, supra*, 4 Cal.4th 132, recent events appear to have worked a modification of the *Dawson/Knox* standard of review. As noted *ante*, at page 989, California voters approved the adoption of Proposition 218 at the General Election held on November 5, 1996. Among other changes, Proposition 218, now codified as articles XIII C and XIII D of the California Constitution, provides that "[i]n any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large." (Cal. Const., art. XIII D, § 4, subd. (f).) We are thus required by this provision, and its modification in the allocation of the burden of proving a special benefit, to restate the standard announced in *Dawson, supra*, 16 Cal.3d at pages 683-684, and reaffirmed by the court in *Knox, supra*, 1 Cal.4th 132. We do so by adopting the following amended formulation (new material in brackets): A court "will not declare the assessment void unless it can plainly see from the face of the record, or from facts judicially known, that the assessment so finally confirmed is not proportional to the benefits, or that no benefits could accrue to the property assessed[, or that the agency has failed to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large]."

III. *Application of the Governing Standard to the Record in This Case.*

Applying that modified standard to the record here, we conclude the water district has met its burden of proof. Although it bears the burden of proving the existence of a special benefit, we agree with the water district that the legislative character of assessment proceedings continues to impose restraints on the scope of judicial review of such proceedings. ■ Specifically, we conclude that case law decided prior to passage of Proposition 218, under which legislative-like determinations by public improvement agencies are reviewed under an abuse of discretion standard, continues to apply in the post-Proposition 218 legal environment. We think this follows from the recognition that such a standard is implicit in the *Dawson/Knox*

scope of review discussed above. From the inception of the use of such entities as a means of financing public improvements, California courts, recognizing the imperfect and sometimes inherently imprecise nature of legislative determinations, have granted improvement agencies latitude in making them. That latitude, implicit in the *Dawson* formulation, and the reasons supporting it, are "instinct" with discretion, to borrow Justice Cardozo's word. (*Wood v. Duff-Gordon* (1917) 222 N.Y. 88, 91 [118 N.E. 214, 214-215].)

In its discussion of the origin and nature of the limited judicial review applicable to assessment issues, the *Dawson* court observed that such districts are established "as a result of a peculiarly legislative process grounded in the taxing power of the sovereign." (Dawson, *supra*, 16 Cal.3d at p. 683.) The court went on to say that the " 'board of supervisors is the ultimate authority which is empowered to finally determine what lands are benefited and what amount of benefits shall be assessed against the several parcels benefited . . . . This determination is made after a full hearing accorded to all persons interested to make such objection as they see fit.' " (*Id.* at p. 684.) It was in light of these observations that the *Dawson* court endorsed a standard of judicial review under which courts "will not declare the assessment void unless it can *plainly see from the face of the record, or from facts judicially known,* that the assessment so finally confirmed is not proportional to the benefits, or that no benefits could accrue to the property assessed." (*Ibid.,* italics added.)

Although we conclude the italicized portion of the *Dawson* standard quoted above has since been altered by enactment of section 4, subdivision (e) of article XIII D of the state Constitution, we think there are sound reasons to continue to apply the remainder of the *Dawson* formulation. The legislative character of such determinations has not been altered by passage of Proposition 218 and we think that, in examining the record to determine if the agency has met the burden of proof imposed by section 4, subdivision (e), courts ought to do so with an awareness of that "peculiarly legislative process." (*Dawson, supra,* 16 Cal.3d at p. 683.)

■ That said, we look to the record made before the water district to determine if it met its burden of proving the existence of a special benefit flowing to petitioners' properties by the formation of assessment district No. 1. A newsletter prepared by the water district for distribution to its customers and made a part of the administrative record, identifies some of these special benefits, including (1) potential increases in property values from the presence of a reliable public water supply for fire suppression

purposes; (2) a potential reduction in fire insurance rates from the positioning of fire hydrants; and (3) not least, enhanced security and safety from the ability to suppress building, grass, and brush fires.

A public information packet developed by the water district describes additional special fire protection benefits flowing to assessment district residents. These include the assessment district's location "in one of the most sensitive fire-prone areas in the [county]. Much of the terrain is steep, there is an abundance of brush and grass, plus many homes and related structures. In addition, the potential for devastating, fast-moving fires such as have occurred in the past is an ever-present danger." The past fire history of the area, the report continued, made the provision of a fire protection system as part of the water district necessary to provide "a reliable water supply for fire protection throughout the district . . . benefit[ing] homeowners and . . . reduc[ing] the turn around time necessary to resupply water for the fire district's water tenders during fire emergencies."

The report goes on to note the current fire suppression practice, using water tenders to truck water to fire sites and noting that "once the imported supply of water is exhausted, each engine or water tender must leave the fire and go to the closest reliable water source (such as the industrial park in the area of Midway Road or the SID fill at Pamela Lane and Gibson Canyon), refill, and return to the scene of the fire. This length of time is estimated to be at least 45 minutes. In this length of time, a fire can easily spread from one location to another, increasing the potential loss of more homes and property. The value of having strategically placed hydrants throughout the district with a fixed, reliable water supply close to road easements improves the district's ability to suppress fires more quickly, and limits the number of units needed to suppress grassland or structure fires."

And, in answer to this question, put by a theoretical water well owner— "There are several property owners that have 2000-gallon water storage tanks and would therefore derive no benefit from a fire hydrant. Why is this not being taken into consideration?"—the district's information packet answered: "There are a number of properties that have on-site water storage tanks for fire protection purposes, which the property owner is responsible for maintaining. The fire district cannot rely on these water storage tanks as a definitive source of water since in some cases the onsite tanks have not been maintained or kept supplied with water. The fire protection system of fire hydrants is designed to provide the fire district with a reliable supply of

water and a volume greater than that which can be supplied by individual property owner onsite storage tanks."[4]

While we might go on with excerpts from the record made before the water district, we think the evidence summarized above is sufficient to discharge the district's burden of proof to show the existence of a special benefit, beyond that conferred on the general public.

IV. *Constitutionality of Weighted Voting Under the Due Process Clause of the Fifth Amendment.*

█ As noted, petitioners' central constitutional challenge to the formation of the assessment district at issue in this suit rests on the due process clause of the Fifth Amendment. Specifically, they contend the district's use of a weighted voting scheme, with its substantial dilutive effect on the voting power of petitioners, offends the constitutional requirement of "one man, one vote" announced in the landmark federal decisions of *Reynolds v. Sims* (1964) 377 U.S. 533 [84 S.Ct. 1362, 12 L.Ed.2d 506], and *Baker v. Carr* (1962) 369 U.S. 186 [82 S.Ct. 691, 7 L.Ed.2d 663].[5] As respondents point out, however, established exceptions to the principle of one person, one vote have been long recognized by the United States Supreme Court and by our own high court. The California Supreme Court canvassed these precedents and the doctrinal exception that has emerged from them in the *Bolen* case.

The *Bolen* litigation arose out of the formation of assessment districts at the locations of rapid transit passenger stations in the Los Angeles area in connection with the construction of that city's metro rail system. In an effort to capture some of the "windfall" appreciation of commercial property surrounding such stations, the transit authority embarked on a program of forming beneficial assessment districts at major metro rail stations. (*Bolen, supra,* 1 Cal.4th at pp. 661-662.) The assessment program was challenged by

[4]For the historical record, we quote one additional question and answer in the district's handout: "What was the damage caused by the fires in the English Hills area during the fire storms known as 'black Sunday' and 'black Tuesday'? [¶] The fires of the 60's were devastating but the Black Thursday fire was the worst in the area in many years. The Black Thursday fire started on September 16, 1965 at approximately 12:30 p.m., in the north English Hills area. The fire was blown by winds at 50 to 60 mph and a temperature of 92 degrees. The Fire loss included 15 homes, 45 other structures and numerous losses of livestock. The Fire was contained at East Monte Vista Avenue and burned approximately 8,500 acres. Mutual Aid was requested immediately with 100 pieces of equipment and over 200 to 300 firefighters on the fire lines."

[5]Although petitioners' briefing raises the claim that the asserted gerrymandering of the antecedent water district boundaries to exclude them from participating in the voting violated constitutional due process requirements, no legal authority is cited in support of that proposition; in light of the omission, we conclude petitioners have abandoned that contention.

interveners in a validation proceeding, chiefly on the ground that the voting scheme employed in referenda on the proposed assessments districts—under which voting was limited to owners of commercial property subject to assessment in the event of approval—violated the equal protection clause of the Fourteenth Amendment. Reversing the Court of Appeal invalidation of the voting scheme, the California Supreme Court, in a five-to-two decision, upheld the property-based qualification to vote. (*Id.* at p. 659.)

As the court's *Bolen* opinion points out, the solution to the constitutional problem presented by statutory classifications that discriminate among voters lies in a handful of United States Supreme Court cases decided in the wake of *Reynolds v. Sims, supra,* 377 U.S. 533. (*Bolen, supra,* 1 Cal.4th at p. 665.) Prominent among these is *Avery v. Midland County* (1968) 390 U.S. 474 [88 S.Ct. 1114, 20 L.Ed.2d 45], where the court ruled that the right protected by *Reynolds*—equality at the ballot box—"is not fundamental under limited circumstances. As the court formulated the exception in *Avery,* . . . these circumstances consist of 'a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other[s] . . . .' " (*Bolen, supra,* 1 Cal.4th at p. 665, fn. omitted, quoting *Avery, supra,* 390 U.S. at pp. 483-484 [88 S.Ct. at p. 1120].) Where the prescribed conditions occur, according to the *Bolen* court, "the strict demands of *Reynolds, supra,* 377 U.S. 533, do not apply and voting power 'may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions' . . . without violating the guarantee of equal protection provided . . . the resulting classification is reasonably related to the statutory objective." (*Bolen, supra,* 1 Cal.4th at p. 665, quoting *Avery, supra,* 390 U.S. at p. 484 [88 S.Ct. at p. 1120].)

Applying these constitutional criteria to the circumstances before it in the *Bolen* case, the high court wrote that the metro rail benefit districts at issue "are not invested with and do not exercise powers remotely similar to the 'general governmental powers' to which the principle of *Reynolds, supra,* 377 U.S. 533, presumptively applies." (*Bolen, supra,* 1 Cal.4th at p. 669.) The court went on to describe the characteristics of the metro rail benefit districts, using language aptly descriptive of assessment district No. 1: "the benefit assessment districts lack virtually any of the incidents of government. In fact, they are little more than formalistic, geographically defined perimeters whose *raison d'être* is to serve as the conceptual medium for the recognition of economic benefits conferred and the imposition of a corresponding fiscal burden." (*Ibid.*) Tellingly, the *Bolen* opinion cites as authority for this last proposition language from the high court's opinion in *Dawson, supra,* 16 Cal.3d 676, where the court, writing of the special

assessment district at issue there, said it "is not a legal entity with officers and corporate rights and duties. [R]ather, such a district, in the words of the Municipal Improvement Act of 1913 (under which the Town council here proceeded), is merely 'the district of land to be benefited by the improvement and to be specially assessed to pay the costs and expenses of the improvement and the damages caused by the improvement.' [Citation.]" (*Dawson, supra*, 16 Cal.3d at p. 683.)

We think this case authority—from *Avery v. Midland County, supra*, 390 U.S. 474, through *Dawson, supra*, 16 Cal.3d 676, to *Bolen, supra*, 1 Cal.4th 654—is sufficiently on point to make it clear that a special benefit assessment district having the characteristics of assessment district No. 1 is not in any meaningful sense a "governmental" entity. The term refers instead to a " 'district of land to be benefited' " (*Dawson, supra*, 16 Cal.3d at p. 683), or to "geographically defined perimeters [which] . . . serve as the conceptual medium for the recognition of economic benefits." (*Bolen, supra*, 1 Cal.4th at p. 669.) Like the benefit assessment districts at issue in *Bolen, supra*, 1 Cal.4th 654, the "organizing principle" behind the limited-purpose assessment district No. 1 is "the recoupment" of some of the additional economic value (and the associated costs) conferred on real property by the establishment of water delivery and fire protection services. Thus, to paraphrase *Bolen*, the narrow purpose for which the district was established "is reflected in the voting scheme that limits the franchise to those who will directly and primarily enjoy the benefits . . . and shoulder the reciprocal burden of assessments"—owners of real property lying within the assessment district. Like the *Bolen* court, "we are satisfied that the governmental unit[] at issue lack[s] the indicia of 'general governmental powers' and . . . qualif[ies] as the sort of 'special-purpose unit[] of government' that [is] not subject to the strict requirements of *Reynolds, supra*, 377 U.S. 533." (*Bolen, supra*, 1 Cal.4th at p. 670.)

Our final inquiry under this heading is the determination whether discrimination *among those enfranchised* in terms of voting power—that is, the use of a weighted system of voting proportional to the financial impact of the assessments to be imposed—violates constitutional requirements. The high court precedents relied on by the *Bolen* court point the way to the answer. The decisive result to be drawn from the conclusion that the strictures of *Reynolds v. Sims, supra*, 377 U.S. 533, do not apply in these circumstances is that the governing constitutional test becomes whether the allocation of voting power in a manner that is proportional to the financial impact of the assessment is not " 'wholly irrelevant to achievement of the [provision's] objectives.' " (*Salyer Land Co. v. Tulare Water District* (1973) 410 U.S. 719, 730 [93 S.Ct. 1224, 1231, 35 L.Ed.2d 659] (*Salyer*), quoting

*Kotch v. Pilot Comm'rs* (1947) 330 U.S. 552, 556 [67 S.Ct. 910, 912, 91 L.Ed. 1093].) That is, absent the application of the *Reynolds* standard, the controlling test is the constitutional "rational basis" standard. (*Salyer, supra,* at p. 732 [98 S.Ct. at p. 1231] ["in the type of special district we now have before us, the question . . . is not whether . . . we would have lumped [all potential voters] together had we been enacting the statute in question, but instead whether 'if any state of facts reasonably may be conceived to justify' California's decision to deny the franchise to lessees while granting it to landowners"].)

That lenient standard is met here for reasons that are obvious. To quote the court's opinion in *Ball v. James* (1981) 451 U.S. 355 [101 S.Ct. 1811, 68 L.Ed.2d 150], relying on *Salyer, supra,* 410 U.S. 719, in upholding a weighted balloting scheme tying voting power to acreage ownership, the state "could rationally make the weight of . . . vote[s] dependent upon the number of acres . . . own[ed], since that number reasonably reflects the relative risks . . . incurred as landowners and the distribution of the benefits and the burdens of the District's water operations." (*Ball, supra,* 451 U.S. at p. 371 [101 S.Ct. at p. 1821].) A like analysis applies here. It is not irrational to allocate voting power in a special district referendum in proportion to the financial impact of the assessments to be imposed. Such an allotment scheme reasonably reflects the benefits and burdens to property owners of the district's operation. Moreover, application of the per capita voting scheme—the "one person, one vote" formula petitioners contend is required by the Fifth Amendment—in these circumstances, would have produced an anomalous disproportionality under which, for example, a property owner assessed for fire protection services in the sum of approximately $3,000 would exercise the same voting power as a property owner assessed approximately $20,000 for multiple water service and fire suppression services. Given the substantial disproportionality in benefits conferred and burdens imposed on these two classes, it is hardly irrational to adopt a weighted voting scheme.

## V. *Weighted Voting Under Articles XIII C and XIII D of the California Constitution.*

As we have seen, because the use of voting tied proportionally to property ownership or comparable economic factors passes federal constitutional muster under limited circumstances, it follows that the Fourteenth Amendment is not an impediment to the voting scheme employed by district officials in the formation of assessment district No. 1. ■ It follows as well that no objection to such a scheme is imposed by the *California* Constitution. But this is so, not because of the effect of state constitutional

provisions comparable to the Fifth Amendment; rather, it follows from the fact that the state's voters approved Proposition 218 at the general election of November 1996. That provision, now codified as articles XIII C and XIII D of the California Constitution, *requires*, as a matter of state constitutional law, the use of weighted voting schemes in all referenda on proposed assessments, defined to include "special assessments" and "benefit assessment," among others. (Cal. Const., art. XIII D, § 2, subd. (b).) That is, section 4, subdivision (e) of article XIII D expressly requires that "[i]n tabulating the ballots [for or against the proposed assessment], the ballots shall be weighted according to the proportional financial obligation of the affected property." The text of that provision being unambiguous and not running afoul of the Fourteenth Amendment, we conclude the use of such a weighted voting scheme in the balloting on assessment district No. 1 was compelled by article XIII D, section 4, subdivision (e) of the California Constitution.

## VI.  *Petitioners' Additional Claims of Invalidity.*

Having concluded the use of a weighted voting scheme in the balloting on the formation of the assessment district did not run afoul of the federal Constitution and is required by the California Constitution, we consider next petitioners' remaining claims of invalidity.

### A.  *Claimed violation of CEQA.*

■ Petitioners contend the formation of assessment district No. 1 violated provisions of CEQA. (Pub. Resources Code, § 21000 et seq.) We agree with the water district that this challenge lacks merit. Our conclusion follows from the peculiarly formal character of an assessment district, as the court explained in *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464 [11 Cal.Rptr.2d 792]. There, a school district had formed a community facilities district in anticipation of using the revenues "in the future to acquire sites for the construction of schools, to lease or purchase portable classrooms and buses, and to rehabilitate future facilities." (*Id.* at p. 468.) A developer with property lying within the community services district filed suit to enjoin establishment of the district on the ground that its formation violated provisions of CEQA. The Court of Appeal disagreed, holding that formation of the facilities district was not a "project" within the meaning of CEQA. That conclusion followed, the Court of Appeal reasoned, from the nature of the facilities district itself. "In our case," the court said, "the causal link between the action (formation of [community facilities district]) and the alleged environmental impact (construction of new schools) is missing. Unlike the formation of a new school

district . . . , the formation of the facilities district here will not create a need for new schools. Nor is the construction of new school facilities entirely dependent upon the formation of [the community facilities district] . . . . [¶] The only foreseeable impact from the formation of [the community facilities district] is that when the District does determine sometime in the future to acquire sites for the construction of schools, to lease or purchase portable classrooms and buses, and to rehabilitate future facilities, it will have some of the funds necessary to do so." (*Id.* at p. 474.)

By a kind of reverse parity of reasoning, we think a comparable analysis applies here. The antecedent formation of the RNVWD—the water district itself—may have qualified as a "project" within the meaning of CEQA, but the subsequent formation of assessment district No. 1, in itself, had no impact on the environment for, as we have explained, it is no more than a "formalistic, geographically defined perimeters whose *raison d'être* is to serve as the conceptual medium for the recognition of economic benefits conferred and the imposition of a corresponding fiscal burden" (*Bolen, supra,* 1 Cal.4th at p. 669) and "not a legal entity with officers and corporate rights and duties . . . [but] 'the district of land to be benefited by the improvement and to be specially assessed to pay the costs and expenses of the improvement and the damages caused by the improvement' " (*Dawson, supra,* 16 Cal.3d at p. 683). It is for that reason, we conclude, that formation of assessment district No. 1 was not a "project" within the meaning of CEQA.[6]

## B. *Petitioners' civil conspiracy claims.*

█ Last, we dispose of what we have characterized as petitioners' "civil conspiracy" claims, the allegations that respondents and others manipulated the statutory public improvement and assessment schemes in such a way to exclude petitioners from participation in the balloting for the creation of the water district, only to subsequently extend its operative effect extraterritorially to encompass and assess petitioners and others whose land lies outside the water district's boundaries. Although petitioners' allegations may raise a

---

[6]To the extent petitioners' CEQA challenge applied to the antecedent formation of the *water* district, it is time-barred. Under CEQA, once a local agency approves a project, it must file a notice of determination, identifying the project and summarizing the agency's environmental conclusions. (Pub. Resources Code, § 21152.) The filing of the notice of determination triggers a 30-day limitations statute requiring prompt legal challenges to the adequacy of the agency's environmental review process. (*Id.,* subd. (b) & (c).) Here, the water district filed a notice of determination for the water system project on June 22, 1999. Petitioners, however, did not file this lawsuit until November 10, 1999, a filing that was timely under statutes governing challenges to the formation of assessment districts. (Sts. & Hy. Code, § 10400.) The lawsuit was not timely, however, as it related to CEQA issues that may have been raised by the formation of the water district.

specter of unfairness, we are compelled by the state of the record before us to conclude the evidence is insufficient to sustain such a conclusion. In support of these claims, petitioners chose to rely on the "legislative" record made before the water district; they did not pursue discovery on their civil conspiracy and fraud claims in the trial court. It is no answer to say petitioners' proof has failed because they were confined to the legislative record made before the district board for they were not. We read both *Dawson, supra,* 16 Cal.3d 676, and *Knox, supra,* 4 Cal.4th 132, as standing for the proposition that the legislative character of public improvement districts and the text of the validation statute combine to limit judicial review to the face of the record *for the purpose of determining the existence of a special benefit.* It does not follow, however (nor in our view could it follow, constitutionally), that judicial review of fact-based challenges to the formation of an assessment district are similarly limited to the face of the record made before the public improvement agency. Indeed, because the legislative character of the municipal proceedings leading to the formation of an assessment district precludes adjudicative-like challenges and the making of a factual record, we do not see how such a limitation could be applied effectively. The only available litigative forum for the development of petitioners' fraud and conspiracy claims, then, lay in the trial court. It was there they were required to pursue evidence supporting those claims if, indeed, such evidence existed.

As it is, however, petitioners in substance have placed before us a lengthy legislative record running some 2,000 pages, elected not to supplement it with any discovery conducted in this mandamus proceeding in the trial court, overlaid it with charges of conspiracy and a species of fraud linked to politically sensitive environmental and developmental concerns, and asked us to reverse. We cannot. Not only is the underlying constitutional challenge to the validity of the weighted voting scheme without merit, but also the record is bare of evidence to substantiate petitioners' conspiracy charges. It is all very well to make allegations of a conspiracy on the part of respondents and unnamed landowners to enrich themselves at the expense of petitioners by trampling their voting rights. The fatal difficulty in granting relief on that score is the absence of evidence supporting those accusations.

On the record before us, we find there is not only sufficient evidence supporting the district's resolutions confirming the formation of assessment district No. 1, but there is little or no *evidence* (as opposed to *allegations* of wrongdoing) to support petitioners' allegations of a species of protracted municipal fraud practiced on the part of district officials and a minority of landowners over the course of some 13 years. We recognize that excluding petitioners from voting on the formation of the water district, while permitting them to cast weighted ballots in the subsequent assessment district

voting (with a reduced voting power) may smack of an inherently unfair way of administering the financing of local public improvements. On the record made below, however, we discern no illegality in respondents' actions.

CONCLUSION

The judgment of the superior court is affirmed.

Reardon, Acting P. J., and Kay, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 15, 2002.